THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |
|---|---|
| Patrick K. Donnelly,<br><br>           Plaintiff,<br><br>v.<br><br>Linden Capital Partners III, L.P.,<br>Linden Capital Partners IV, L.P.,<br><br>           Defendants. | C/A No.: 2:20-cv-3719-RMG<br><br>**ORDER AND OPINION** |

The matter before the Court is Plaintiff, Patrick K. Donnelly's motion to strike the expert opinion and report of Defendants' expert Anthony Ecock pursuant to Rule 702 of the Federal Rules of Evidence. (Dkt. No. 84). For the reasons stated below, the motion is granted in part, denied in part.

**I.     Background**

This is a breach of contract and unjust enrichment action in which Patrick K. Donnelly ("Plaintiff") alleges Linden Capital Partners III, L.P. and Linden Capital partners IV, L.P. (collectively "Linden") owe him fees for services he performed as an operating partner for Linden. Linden is a private equity firm that focuses on the healthcare sector, and Plaintiff is an experienced executive in the medical device and pharmaceutical development industries. In 2015, Plaintiff and LCP III executed an Operating Partnership Agreement ("OPA") where Plaintiff agreed to provide Linden certain advisory and consulting services. The OPA provides that operating partners would receive compensation in the form of consulting fees along with transaction fees. The OPA states that an operating partner is eligible to receive transaction fees, "upon the completion of an equity

investment by Linden in a Target Company for which Operating Partner has significantly contributed to sourcing, winning and/or performing due diligence as determined solely by Linden in its own discretion, Operating Partner will receive a cash fee of 10 % of the transaction fee related to the capital invested by Linden Capital Partner III LP and Linden Capital Partners III-A LP as determined solely by Linden." (Dkt. No. 89-5 at § 2). In 2017, Linden formed Advarra. In November 2017, Plaintiff signed an Employment Agreement with Advarra and agreed to become its CEO. Plaintiff alleges he served as an operating partner for Linden while serving as CEO of Advarra, for which Linden owes him compensation.

Plaintiff moved to strike the opinion of Linden's expert, Anthony Ecock. Defendants oppose Plaintiff's motion to strike. The matter is ripe for the Court's review.

## II.     **Legal Standard**

Rule 702 of the Federal Rules of Evidence governs expert witness testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d). "Implicit in the text of Rule 702 is a district court's gatekeeping responsibility 'to ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.' " *Nease v. Ford* Motor *Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphasis in original) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993)). First, "[w]ith respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Nease*, 848 F.3d at 229

(internal quotation marks omitted). "As the Supreme Court has repeatedly explained, *Daubert v. Merrell Dow Pharmaceuticals, Inc.* [ ] offers district courts several guidepost factors that the court '*may* consider' in assessing an expert's evidentiary reliability to the extent that the factors are relevant to the specific facts of the case at hand." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 959 (4th Cir. 2020) (emphasis in original). The "emphasis on the word 'may' [ ] reflects *Daubert*'s description of the Rule 702 inquiry as 'a flexible one.' " *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 594). Factors that the district court may consider include: (1) "[w]hether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) its "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has garnered "general acceptance." *Daubert*, 509 U.S. at 593-94; *accord United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014).

"These factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." *McKiver*, 980 F.3d at 959 (alteration in original) (internal quotation marks omitted). The *Daubert* list of factors is not "definitive or exhaustive." *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003). Instead, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142. For instance, courts have also considered whether experts "developed [their] opinions expressly for the purposes of testifying," *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158 (Table), 1998 WL 546097, at *3 (4th Cir. Aug. 20, 1998) or "though research they have conducted independent of the litigation," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (on remand). This is because, at bottom, the "objective of

3

[the *Daubert* gatekeeping requirement] ... is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

The reliability inquiry requires the district court to heed "two guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "On the one hand, ... Rule 702 was intended to liberalize the introduction of relevant expert evidence," *id.*, and "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system," *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (citing Fed. R. Evid. 702 advisory committee's note), *cert. denied*, 134 S. Ct. 1002 (2014). Indeed, "[a]s with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "[b]ecause expert witnesses have the potential to be both powerful and quite misleading, it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *Fultz*, 591 F. App'x at 227 (internal quotation marks omitted). Thus, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261. For this reason, the "proponent of the testimony" bears the burden of proving it is reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). This reliability standard does not require proof "that the opinion is objectively correct, but only that the witness has sufficient expertise[.]" *TBL Collectibles, Inc. v. Owners Ins. Co.*, 385 F. Supp. 3d 1170, 1179 (D. Colo. 2018).

Second, in addition to being reliable, the testimony must be relevant, which, "of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 591). The district court's decision on the admissibility of expert testimony is reviewed for abuse of discretion. *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020).

### III.    Discussion

Defendants offer Ecock as expert in the private equity field. (Dkt. No. 94 at 10). Plaintiff does not dispute that Ecock is sufficiently experienced as a private equity business executive. (Dkt. No. 84 at 1). Ecock offers four opinions that relate to the parties' disagreement over whether the OPA was terminated after Plaintiff became the CEO of Advarra and if the OPA was in effect, whether Plaintiff continued to perform services as an operating partner that would entitle him to consulting fees and certain transaction fees for deals Plaintiff alleges he significantly contributed to. From this dispute arises the parties' interest in litigating, through dueling expert opinions, the topic of whether Plaintiff is entitled to compensation from Defendants.

Ecock provides four opinions in this case that can be summarized as follows:

1) Opinion One: "The OPA was terminated and no longer in effect after November 7, 2017." (Dkt. No. 84-1 at ¶¶ 98-124);

2) Opinion Two: "Even assuming the OPA had been in effect, the disputed transactions would not have satisfied the conditions for Plaintiff to be entitled to a percentage of transaction fees under the terms of the OPA." (*Id.* at ¶¶ 125-153);

3) Opinion Three: "[Plaintiff's] involvement in the disputed transactions was pursuant to his primary role as chairman, CEO or board member, not as an operating partner, and in those roles he would be conflicted in asking for or receiving a separate transaction fee." (*Id.* at ¶¶ 154- 160);

4) Opinion Four: "Linden applied its discretion fairly to Plaintiff, i.e. acted in good faith in concluding that Plaintiff was not entitled to compensation beyond what he received." (*Id.* at ¶¶ 161-168).

Plaintiff moves to strike all of Ecock's opinions on the ground Opinions One, Two, and Four offer impermissible legal conclusions and on the ground that none of his opinions will assist a jury. The Court will discuss the issues in turn.

### A. Whether Ecock's Opinions One, Two, and Four Draw Legal Conclusions

As a preliminary matter, Plaintiff asserts that Ecock is not an attorney and therefore may not offer a reliable opinion in this case because the disputes center around a contract. (Dkt. No. 84 at 8). Plaintiff argues Ecock testified he does not have sufficient experience to opine on legal issues, described his legal education as minimal, and admitted he does not draft contracts as a businessperson. (Dkt. No. 113-2, Ecock Depo. at 46: 18-47:5, 51:14-15, 167:11). Upon a review of Ecock's report and qualifications, the Court rejects Plaintiff's broad attack on Ecock's experiences as inadequate to render a reliable opinion on the disputed issues related to the OPA simply because he does not have formal legal training.

Ecock's career in private equity spans across thirty years. (Dkt. No. 84-1 at ¶ 3). His experience in the field includes serving as operating partner, chairman, and board member on several leading healthcare and business service companies for Welsh Carson Anderson & Stowe. (*Id.* at ¶ 7). He acted as "managing director working on sourcing, winning, and diligencing new platform deals across various industries" for The Carlyle Group. (*Id.* at ¶ 4). He was managing director for investments in the healthcare sector where he worked with the operating partner team and hired outside operating partner resources and board members. (*Id.* at ¶ 5). He worked with operating partners who sourced deals and understood how operating partners would be compensated for the transactions. (*Id.* at ¶ 5). He negotiated CEO and other executive contracts. (*Id.* at ¶ 5). Viewing Ecock's experiences as a business executive in the private equity industry, it is clear Ecock has substantial knowledge about the operating partner's role in sourcing healthcare

deals, experience structuring and negotiating operating partner contracts, and knowledge regarding compensating operating partners for sourcing and contributing to deals.

Plaintiff substantively attacks Ecock's Opinions One, Two, and Four contained in his expert report on the ground the opinions are legal conclusions related to the enforceability of the OPA, interpretation of certain terms in the OPA, and the performance obligations of the parties under the OPA. (Dkt. No. 84 at 9).

It is well settled that it is the duty of the district court, not a party's expert, to state the meaning of the law. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Opinion testimony that states a legal standard or draws a legal conclusion by applying law to facts is generally inadmissible. *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006). "An opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact, [but] such an opinion may be excluded if it is not helpful to the trier of fact under Rule 702." *Kopf v. Skyrm*, 993 F.2d 374, 377-78 (4th Cir. 1993). "Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determinations." *Barile*, 286 F.3d at 760. "The role of the district court, therefore, is to distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion." *Id*. "The best way to determine whether opinion testimony contains legal conclusions, is to determine whether the terms used by the witness have a separate, distinct, and specialized meaning in the law different from that present in the vernacular." *Id*.

As to Opinion One, it states: "The OPA was terminated and no longer in effect after November 7, 2017." (Dkt. No. 84-1 at ¶¶ 98-124). Plaintiff argues this is a legal conclusion. The question is whether this opinion is an impermissible legal conclusion or if it is drawn from something inside Ecock's qualified expertise, such as his relevant experience. A review of the

7

context of Ecock's opinion reveals Opinion One relies heavily on the facts from this case. For example, Ecock states Plaintiff could not have served as the full time CEO of Advarra if the OPA was still in effect, which was understood by the parties. (Dkt. No. 84-1 at ¶¶ 11-13). He states that Plaintiff expressly acknowledged the OPA terminated in two written communications where he indicated he would no longer be an operating partner such that his monthly draw would terminate. (*Id*. at ¶¶ 99-100). He states that Plaintiff transitioned from operating partner to CEO and Linden immediately terminated the OPA payments. (*Id.* at ¶ 115). He states that Plaintiff's course of conduct for the two years following November 7, 2017, demonstrates the OPA was terminated. (*Id.* at ¶ 103); *see also* (*Id.* at ¶¶ 101-108, 110-112, 115-119).

Ecock's opinion incorporates a few citations to his experience working with operating partners in the private equity field. For example, he states that Plaintiff did not ask for further payments under the OPA which typically private equity executives would have done had compensation been owed. (*Id.* at ¶¶ 104-107, 109, 113). He states that Plaintiff's lack of requests for payment under the OPA after signing the Advarra Employment Agreement reflects an "extremely common" loose relationship between private equity firms and operating partners who serve as portfolio company officers or directors who often continue to perform quasi-operating partner tasks on an informal, unpaid basis as part of a collaborative business relationship. (*Id.* at ¶ 113, 120-122). He states that it is common for portfolio company CEOs to continue to refer to themselves as "operating partners" or "senior advisors" whether or not they have an active agreement, because the public affiliation with the private equity fund is beneficial to their careers. (*Id.* at ¶ 122).

The opinion that the OPA was terminated and not in effect as of November 7, 2017, is a legal conclusion that embraces the ultimate issue of whether the OPA was in effect after Plaintiff

became the CEO of Advarra.  Ecock's Opinion One will not help the jury in this case because the opinion relies heavily on Ecock's analysis of the evidence in this case which include review of emails and conversations with Linden partners. "It does not help the jury for an expert to give testimony that states a legal standard or draws a legal conclusion by applying law to the facts, because it supplies the jury with no information other than how the witness's view of how the verdict should be read.  *United States v. Offill*, 666 F. 3d 168, 175 (4th Cir. 1993).  Plaintiff's motion to strike is granted as to Ecock's Opinion One.

Next, Plaintiff objects to Ecock's Opinion Two which reads: "Even assuming the OPA had been in effect, the disputed transactions would not have satisfied the conditions for Plaintiff to be entitled to a percentage of transaction fees under the terms of the OPA." (Dkt. No. 84-1 at ¶¶ 125-153).  Plaintiff argues Ecock interprets the terms of the OPA as to whether Plaintiff satisfied the conditions that entitle him to payment under the OPA. (Dkt. No. 84 at 11).

Under federal law, experts cannot testify as to conclusions of law, and an interpretation of a contract is a conclusion of law. Whether a party breached a contract, as well as the proper interpretation of a contract are "question[s] of law," and an expert cannot give an opinion as to the legal obligations of parties under a contract.  *Donnert v. Feld Ent., Inc.*, No. 1:13-cv-40, 2013 WL 12097618, at * 2-3 (E.D. Va. No. 8, 2013) (excluding expert testimony regarding expert's opinion on the interpretation on what the lease provision meant and what actions would constitute compliance with that provision); *Forrest Creek Assocs., Ltd. v. McLean Sav. And Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987) (finding contract interpretation is a question of law).  Expert witnesses cannot provide opinions as to the legal obligations of the parties under a contract.  *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1977) (excluding expert testimony where witness gave opinion as to legal standards which he believed to be derived from the contract and

which should have governed the parties' conduct and testified not so much as to common practice as to what was necessary to "fulfill the covenant.").

To reach Opinion Two, Ecock analyzes the technical documents that include line-item entries related to the funding sources utilized in the transactions where Plaintiff alleges he is entitled to a transaction fee. Ecock uses this data to conclude whether LCP III made an equity investment in a particular transaction, or whether the disputed transaction was the type of transaction that private equity funds would compensate operating partners for. (Dkt. No. 84-1 at ¶¶ 132-136). As part of his discussion, Ecock distinguishes debt versus equity investment according to his knowledge of industry practice. (*Id.* at p. 34, fn 74-75). Ecock states that none of the disputed transactions contemplated by the OPA involved an equity investment because it only contemplated platform deals funded by equity, not transactions funded through debt rather than equity investment, or other add-on transactions (*Id.* at ¶¶ 127, 132-133). Ecock states that he is not aware of any other operating partners ever receiving a transaction fee for an add-on investment because it would require all of the private equity firm's resources. (*Id.* at ¶¶ 127-130). He states that typically, platform companies staff source their own add-on transactions, and no fees are paid CEOs or board members due to the obvious conflict it would pose. (*Id.* at ¶ 131).

The Court finds that Ecock's Opinion Two does not interpret the parties' service obligations under the OPA, the terms of the OPA, or whether a party breached the OPA. *Forrest Creek Assocs., Ltd.*, 831 F.2d at 1242. Ecock draws from his breadth of experience in the industry to explain the customary practices for making an equity investment and for compensating an operating partner for a transaction fee. He applies his understanding of those practices to the facts of the case to determine that Linden did not make an equity investment and therefore, Plaintiff is not entitled to a transaction fee. "What the terms mean in the industry context, moreover, is not

an 'issue[] of common understanding which jurors' reasonably may be expected to understand for themselves . . ., but rather is a 'specialized, technical matter concerning which a lay juror may benefit from a qualified expert's tutelage.'" *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 124 (D.D.C. 2018). Plaintiff's motion to strike is denied as to Ecock's Opinion Two.

Next, Plaintiff takes issue with Ecock's Opinion Four which states: "Linden applied its discretion fairly to Plaintiff, i.e. acted in good faith in concluding that Plaintiff was not entitled to compensation beyond what he received." (Dkt. No. 84-1 at ¶¶ 161-168). More specifically, Plaintiff objects to Ecock's opinions that conclude Linden acted in "good faith" or "reasonably" or that paying Plaintiff a transaction fee would raise "fiduciary duty" concerns. Plaintiff argues Ecock impermissibly interprets the terms of the OPA to determine whether Linden could have fairly applied its discretion not to pay Plaintiff transaction fees. (Dkt. No. 84 at 11).

The Fourth Circuit held that "when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized meaning." *Barile*, 286 F.3d at 760. In a securities fraud case, the District of South Carolina excluded expert opinion testimony that purported to inform the jury of "how a corporation, its board of directors, and audit committee operate so that jurors can make an informed decision about whether the defendants . . . acted in good faith or not." *Id.* at * 4. The court held the expert could testify only as to "issues of fact such as (but not limited to) the following: general corporate governance structure; role of officers, directors, and audit committee members; and general examples of what the experts believe are good corporate practices in conformance with industry custom." *Id*. The court held that the experts could not testify as to the

11

"ultimate legal conclusion as to whether the defendants discharged their duties or acted in good faith. Nor [can] the defendants' experts testify as to what legal standard, such as reasonableness, applies to a particular claim. The legal conclusion is for the jury to reach, and the governing legal standard will be given by this court." *In re Safety-Kleen Corp. S'holders Litig.*, No. 3:00-736-17, 2004 WL 6039473, at * 4 (D.S.C. Jan. 29, 2004).

Plaintiff objects to Ecock's opinion Linden "concluded in *good faith* and reasonably that the deals in question simply did not qualify for a transaction fee . . . ". (Dkt. No. 84-1 at ¶¶ 163, 167) (emphasis added). The term "good faith" carries an independent legal meaning and Ecock's opinions as to whether Linden acted in good faith to determine that Plaintiff was not eligible to receive a transaction fee pursuant to the OPA amount to an impermissible legal conclusion.

Plaintiff raises an objection to Ecock's opinion that Linden "concluded in good faith and *reasonably* that the deals in question simply did not qualify for a transaction fee . . .". (Dkt. No. 84-1 at ¶ 163,166, 167) (emphasis added). The Fourth Circuit has held that an expert's testimony on whether a party acted reasonably is "precisely the type of expert testimony that could assist the trier of fact in its determination." *Barile*, 286 F.3d at 761 (holding that opinion testimony on whether data submitted in a 510(k) submission were reasonable would not merely state a legal conclusion and therefore is not excludable on the ground that it invades the province of the jury.). The court finds that Ecock's opinion concerning whether Linden reasonably determined that Plaintiff was not entitled to certain transaction fees does not state a legal conclusion and is not excludable.

Plaintiff objects to Ecock's opinion that paying Plaintiff a transaction fee in the deals at issue would "raise significant fiduciary duty concerns . . . ". (Dkt. No. 84-1 at ¶¶ 43, 67, 151). In his report, Ecock provides an overview of the private equity industry and discusses the distinction

between "platform" and "add-on" transactions. (*Id.* at ¶¶ 41-52). He states, "in his experience, it would be inconsistent with industry practices and expectations for the same individual to be involved on both the buyer's side and the seller's side of a transaction, and it would be an obvious conflict of interest if the individual were to request or receive a transaction fee or incentive from both the buyer and the seller." (*Id.* at ¶ 43). His report generally discusses the role of operating partners and how the fiduciary duty role has been clarified over time. He indicates the SEC has rules that require private equity firms and boards to have some protections over the interest of equity holders while maintaining a fiduciary responsibility to the interests of creditors. (*Id.* at ¶ 67). Ecock states that based on his "extensive experience in [private equity]" along with his knowledge of limited partner agreements and private equity fund's fiduciary responsibilities, paying Plaintiff a fee for Project Bearcat "would raise significant fiduciary duty concerns and would not be customary in the [private equity] industry." (*Id.* at ¶ 151). From a review of Ecock's opinions regarding fiduciary duty, it is clear he does not assert an opinion that Plaintiff had a fiduciary duty as a matter of law or breached any fiduciary duty. Rather he offers an opinion based on his experience regarding potential conflict of interest and fiduciary issues that may arise when compensating operating partners for certain types of transactions and outlines the obligations equity firms have to creditors and investors. Such opinions are proper.

Plaintiff's motion to strike is narrowly granted as to Ecock's Opinion Four to the extent it opines that Linden acted in "good faith". It is denied as to Ecock's opinions regarding "fiduciary duty" and "reasonableness."

### B. Whether Ecock's Opinions Will Assist the Jury

Plaintiff argues none of Ecock's opinions will not assist a jury. (Dkt. No. 84 at 15). Rule 702 is broadly interpreted, and helpfulness to the trier of fact is its "touchstone." *Friendship*

*Heights Assocs. v. Koubek,* 785 F.2d 1154, 1159 (4th Cir.1986). Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror. *Persinger v. Norfolk & W. Ry. Co.,* 920 F.2d 1185, 1188 (4th Cir.1990) (testimony about how difficult it is to lift heavy things is not "helpful" and is thus excludable). The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend. *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993). If the proposed testimony will recount or employ "scientific, technical, or other specialized knowledge," it is a proper subject. *Id*. "There is no gap between the 'specialized knowledge' that is admissible under the rule and the 'common knowledge' that is not." *Id*. "The boundary between the two is defined by helpfulness." *Id*.

The details of private equity funds' investment and management practices are outside the domain of an ordinary person's knowledge and might be helpful to the decisionmaker. *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845, 853 (E.D. Mich. 2010); *Goldenson v. Steffens*, No. 2:10-CV-00440-JAW, 2013 WL 682844, at *12 (D. Me. Feb. 25, 2013) (admitting expert testimony to explain the difference between "hedge fund portion" and "private equity portion" because "these are no subjects within the common lay knowledge" and the expert's explanations are likely to enhance the jury's understanding.).

Ecock has a long career in the private equity industry that includes working as an operating parting, managing operating partners, and negotiating operating partner agreements. His specialized knowledge of the private equity industry informs the majority of the opinions he offers in this case on issues that are outside the scope of the ordinary person's knowledge. Thus, his opinions will be helpful to the decisionmaker.

The Court finds that Ecock's Opinions Two, Three, and Four (except for reference to Linden's exercising "good faith") will be helpful to the jury.

## IV.     Conclusion

For the reasons stated above, Plaintiff's motion to strike the expert opinions of Linden's expert Anthony Ecock is **GRANTED IN PART, DENIED IN PART**.  (Dkt. No. 84).

The motion is **GRANTED** as to Ecock's Opinion One; and Opinion Four to the extent Ecock opines Linden acted in good faith when determining Plaintiff's eligibility for certain disputed transaction fees.

The motion is otherwise **DENIED**.

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel
Richard M. Gergel
United States District Judge

June 28, 2022
Charleston, South Carolina