**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

|  |  |  |
|---|---|---|
| Patrick K. Donnelly, | ) | C/A No.: 2:20-cv-03719-RMG |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | **ORDER AND OPINION** |
| v. | ) |  |
|  | ) |  |
| Linden Capital Partners III, L.P., | ) |  |
| Linden Capital Partners IV, L.P., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

Before the Court is Plaintiff, Patrick K. Donnelly's partial motion for summary judgment (Dkt. No. 86) and Defendants Linden Capital Partners III, L.P and Linden Capital Partners IV, L.P.'s motion for summary judgment. (Dkt. No. 89). For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment, and grants in part, denies in part Defendants' motion for summary judgment.

## I.    Background

This is a breach of contract and unjust enrichment action filed by Patrick K. Donnelly ("Plaintiff") against Linden Capital Partners III, L.P ("LCP III") and Linden Capital Partners, IV L.P. ("LCP IV"). (Dkt. Nos. 1; 66). Plaintiff is an executive in the medical device and pharmaceutical field. LCP III and LCP IV (collectively "Linden") are private equity firms that invest in healthcare companies. Around December 14, 2015, Plaintiff signed an Operating Partner Agreement ("OPA") with LCP III and "affiliated investment funds" where Plaintiff agreed to perform certain services for Linden as an operating partner. (Dkt. No. 89-5). Pursuant to the OPA, either party could terminate the agreement with "30 days prior written notice." (*Id.* at § 1). As an

operating partner under the OPA, Plaintiff agreed to provide advisory services to Linden as an independent contractor.  (*Id.* at §§ 1, 3).  The OPA anticipated Plaintiff would "serve as a Chief Executive Officer if Linden acquires or invests in a target company for which [Plaintiff] . . . performed services" as outlined in the OPA.  (*Id.* at § 1).  The OPA states that an operating partner is expected to spend "a minimum of 50 % of . . . working time providing Advisory Services." (*Id.*).

The OPA outlines two ways in which operating partners are compensated through consulting fees and transaction fees. As to consulting fees, the OPA states that operating partners will receive an annual "consulting fee of $180,000.00, payable monthly in arrears (pro-rated for any partial year)." (*Id.* at § 2).  As to transaction fees, the OPA states that "upon the completion of an equity investment by Linden in a Target Company for which Operating Partner has significantly contributed to sourcing, winning and/or performing due diligence as determined solely by Linden in its own discretion, Operating Partner will receive a cash fee of 10 % of the transaction fee related to the capital invested by Linden Capital Partner III LP and Linden Capital Partners III-A LP as determined solely by Linden." (*Id*. at § 2).

In November of 2017, Linden formed Advarra, Inc. ("Advarra").  Plaintiff signed an Employment Agreement with Advarra to become the Chief Executive Operator ("CEO") that was effective November 8, 2019.  (Dkt. No. 86-5); (Dkt. No. 86-16).  Defendants stopped compensating Plaintiff as an operating partner under the OPA after November 7, 2017.  (Dkt. No. 97 at 8); (Dkt. No. 86 at 6).  Plaintiff alleges that in November 2017, Linden Capital partners IV, L.P was formed.  (Dkt. No. 66 at ¶ 53-54).[1]

---

[1] Plaintiff alleges that aside from the OPA with LCP III, he did not enter into any other agreements with LCP III or LCP IV that addressed consulting fees or earned transaction fees, or any such similar payments.  (Dkt. No. 66 at ¶ 57).

Plaintiff alleges that while he served as CEO of Advarra, he also carried out his duties as a Linden operating partner and consultant under the OPA.  (*Id*. at ¶ 150). Plaintiff alleges Linden failed to compensate him for consulting fees he earned as an operating partner between November 2017 and August 2019.  (Dkt. No.66 at ¶¶ 58-62).  Plaintiff alleges that during this timeframe he worked on five transactions as an operating partner where Linden made an equity investment and did not compensate him for earned transaction fees. (*Id.* at ¶¶ 63-68); (Dkt. No. 66-2).

On October 22, 2020, Plaintiff initiated this action.  (Dkt. No. 1).  Plaintiff filed an amended complaint on May 6, 2021.  (Dkt. No. 66).  The amended complaint asserts four claims for: (1) breach of contract as to LCP III for failure to pay consulting fees under OPA; (2) breach of contract as to LCP III for failure to pay earned transaction fees under OPA; (3) unjust enrichment as to LCP III; and (4) unjust enrichment as to LCP IV.  (Dkt. No. 66).

Plaintiff filed a partial motion for summary judgment that is fully briefed. (Dkt. Nos. 86; 97; 101).  Defendant filed a motion for summary judgment that is fully briefed. (Dkt. Nos.  89; 95; 98). The matters are ripe for the Court's review.

## II.    <u>Legal Standard</u>

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *See id.*  Therefore, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987).

"In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the non-moving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment must demonstrate that specific, material facts exist that give rise to a genuine issue. *See id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)). Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

### III.  **Discussion**

### 1.  **Whether the OPA Terminated Upon Plaintiff Signing the Advarra Employment Agreement and Becoming CEO of Advarra**

The parties' cross-motions for summary judgment dispute whether the OPA remained in effect after Plaintiff signed the Employment Agreement with Advarra. Plaintiff argues Linden did not terminate the OPA because it did not provide any written notice of termination pursuant to the written notice requirement in the OPA. (Dkt. No. 86 at 8). Linden argues Plaintiff understood the OPA would terminate on November 7, 2017, when Plaintiff signed the Employment Agreement with Advarra and accepted the position of CEO of Advarra. (Dkt. No. 89-1 at 22-26). The Court will review the record to determine whether the OPA was terminated after November 7, 2017.

The OPA contains an Illinois choice of law provision. The Court's prior order that ruled on Linden's motion for judgment on the pleadings determined that the OPA's choice of law

4

provision governed Plaintiff's breach of contract claims. (Dkt. No. 45 at 5) (citing *Datronic Equip. Income Fund XVII, L.P. v. Am. Bus. Leasing*, No. 89 C 5555, 1990 WL 16776, at * 2 (N.D. Ill. Feb. 5, 1990) ("Whether a contract exists and whether there is cause to believe it has been terminated are questions involving the interpretation and construction of the contract"); *MJ & Partners Rest. Ltd. P'ship*, 995 F. Supp. at 931 n. 1 ("Since the restaurant license agreement in this case provides that the 'validity, construction and enforceability of this Agreement shall be governed in all aspects by the laws of the State of Illinois,' we will apply Illinois contract law.").

Illinois law defines sufficient notice to terminate a contract as that "which clearly discloses to persons of ordinary intelligence what is intended." *Paradise v. Augustana Hosp. & Health Care Ctr.*, 584 N.E.2d 326, 328 (Ill. App. 1991) (citing *Wendl v. Moline Police Pension Board*, 421 N.E.2d 584 (Ill. App. 1981). It is not required that adequate written notice specifically contain the word 'termination.'" *Id*. at 677 (citing *Pullman, Inc. v. Int'l Bhd. of Boilermakers*, 354 F. Supp. 496, 498 (E.D. Pa. 1972). The general rule is that "notice to terminate a contract under an express provision must be clear and unequivocal." *Todd. v. Corp. Life Ins. Co.*, 89 C 7711, 1990 WL 16430, at * 4 (N.D. Ill. Feb. 15, 1990), *aff'd in part, vacated on separate grounds*, 945 F.2d 204 (7th Cir. 1991). Thus, the focus is on whether the notice is sufficiently clear to apprise the other party of the action being taken. *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003). The related conduct of the parties, including conduct between the giving of notice and the actual date of termination, may be considered in determining whether there has been a clear and unequivocal termination. *Id*. (citing *Accu-Weather, Inc. v. Prospect Commc'ns, Inc.*, 644 A.2d 1251, 1255 (Pa. Super. 1994)).

In this case, the OPA required written notice to terminate the agreement. The OPA states "[e]ither party may terminate the [agreement] at any time, for any reason, upon 30 days prior

written notice to the other party." (Dkt. No. 86-1 at § 1). Anthony Davis, the President and Managing Partner of Linden, testified the Advarra Employment Agreement operated as legal and written termination of the OPA. (Dkt. No. 86-3, Davis Depo. at 194: 21-25); *see also* (Dkt. No. 86-7, Sullivan Depo. 51: 24-52: 7) (testifying the Advarra Employment Agreement constitutes written notice of terminating the OPA). Mr. Davis testified he had "explicit" conversations with Plaintiff where he believed Plaintiff understood that the Advarra Employment Agreement would terminate the OPA with Linden. Based on those conversations, he did not send Plaintiff written notice of termination of the OPA. (Dkt. No. 86-3, Davis Depo. at 192: 21-25, 193: 16-22, 194: 16-18, 21-15)

Plaintiff sent two emails to Linden regarding the OPA. First, on October 20, 2017, Plaintiff sent an email to Linden partner, Kamlesh Shah, titled "Employment Agreement" that states, "[n]ot that I can be a full Operating Partner I was wondering how much Linden wanted going forward. . ." and "[a]lso wonder about current deals in the Pipeline and anything down the road. Totally understand that my monthly draw will terminate." (Dkt. No. 89-14). Mr. Shah testified that he understood this email from Plaintiff to be Plaintiff's acknowledgment that the OPA would terminate if he took the Advarra CEO role. (Dkt. No. 86-6, Shah Depo. at 54:5-9). Mr. Shah did not send Plaintiff a written termination of the OPA after receiving Plaintiff's October 2017 email. (*Id*. at 227: 23-228:8). In November 2018, Plaintiff sent an email to Doug VanDegrift of Linden, regarding SEC compliance where Plaintiff asked, "[a]s I look at this should we reference the old Operating Agreement? It is no longer in effect." (Dkt. No. 89-2 at 3). Plaintiff believed that upon the formation of LCP IV, he would enter a new OPA that would supersede the terms of the OPA with LCP III and govern the relationship between him and LCP IV. (Dkt. No. 95-48 at 3).

6

Linden argues the Advarra Employment Agreement supersedes the OPA because it contains terms that are inconsistent or incompatible with the OPA. (Dkt. No. 89-1 at 23); (Dkt. No. 86-7, Sullivan Depo. at 52: 7-10). Linden argues that under Illinois law, "when parties to a contract sign a new agreement that contains terms clearly inconsistent with the previously existing contract or claim, the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new." *Printing Mach. Maint., Inc. v. Carton Prod. Co.*, 147 N.E.2d 443, 448 (Ill. App. Ct. 1957). Plaintiff argues the OPA contemplates Plaintiff taking on a CEO role and the Advarra Employment Agreement contemplates Plaintiff remaining in certain roles for affiliated companies. (Dkt. No. 101 at 7-8).

The record reflects that the parties agree the OPA expressly contemplates Plaintiff's future ability to serve as CEO of one of Linden's platform companies. (Dkt. No. 66-1 at ¶ 1); (Dkt. No. 86 at 2): (Dkt. No. 97 at 7); (Dkt. No. 86-3, Davis Depo at 273: 11-13, 16-20). On November 7, 2017, Plaintiff executed the Advarra Employment Agreement to which Linden is not a party. The Employment Agreement does not contain a provision that expressly terminates the OPA but contains language that limits Plaintiff's ability to work in other employment opportunities while acting as CEO of Advarra. For example, Section 3(a) of the Advarra Employment Agreement states that the "[e]mployee shall not: (a) work on a part-time or independent contracting basis for any other company, business, or enterprise without the written prior consent of the Board." (Dkt. No. 95-5 at § 3(a)); *see also* (Dkt. No. 95-5 at § 14 "[e]mployee . . . is not entitled to any salary, bonus, benefits, severance, deferred compensation, or similar payments from the company or any of its affiliates as expressly set forth herein."). However, the Advarra Employment Agreement also contemplates Plaintiff working in certain positions and serving on boards for affiliated companies. It carves out an exception to Section 3(a) to allow "employee to serve in positions

employee holds and boards of directors on which employee serves with affiliates of the company . . . so long as such services do not (i) interfere with Employee's ability to discharge Employee's responsibilities to the company and its subsidiaries; or (ii) detract from the business of the Company and its subsidiaries." (*Id.* at § 3(b)).

Upon a review of the record, the Court finds there are several questions of material fact as to whether the OPA terminated when Plaintiff executed the Employment Agreement with Advarra on November 7, 2017. The cross motions for summary judgment are denied as to whether the OPA was in effect after November 7, 2017.

## 2. Whether Plaintiff Remained an Operating Partner at Linden from November 7, 2017 through August 2019

Plaintiff alleges that while acting as CEO of Advarra he remained an operating partner at Linden between November 7, 2017, through August 2019 for which Linden owes him compensation. (Dkt. No. 66 at ¶ 150). Plaintiff's partial motion for summary judgment argues there is no issue of material fact he remained an operating partner during this timeframe. (Dkt. No. 86 at 12). In response, Defendants argue Plaintiff did not perform the duties of an operating partner that would make him eligible for compensation under the OPA. (Dkt. No. 97 at 15).

The record reflects the OPA provides annual compensation of $180,000.00 to operating partners for providing advisory services to Linden. (Dkt. No. 95-1 at § 2). Linden testified that after Plaintiff became the CEO of Advarra, he continued in his role as operating partner with Linden. *See e.g.*, (Dkt. No. 86-7, Sullivan Depo. at 72: 6-9) (testifying Plaintiff had an operating partner role at Linden after he became CEO of Advarra but not in a full-time capacity); (Dkt. No. 86-4, Farah Depo. at 35: 9-16) (testifying that after Plaintiff became CEO of Advarra he performed operating partner "light duties" but not "full lead" operating partner work); (Dkt. No. 86-3, Davis

Depo. at 202: 2-24) (testifying that after Plaintiff became CEO of Advarra he maintained the title of operating partner without compensation and attended some Linden investment calls).

Linden testified that even after Plaintiff became the CEO of Advarra, he was represented as an operating partner in some capacity to Linden investors.  *See e.g.*, (Dkt. No. 86-6, Shah Depo. at 231) (testifying Plaintiff was not a full operating partner per the definition in the OPA after November 7, 2017, as Plaintiff was not "sourcing or diligencing new platform transactions" and Linden disclosed to investors that Plaintiff was not a "full" operating partner but was an operating partner of some sorts); (Dkt. No. 86-4, Farah Depo. at 262: 11-21) (testifying that in a February 20, 2018, bid letter, Linden described Plaintiff as an operating partner).  Plaintiff was represented as an operating partner in Linden business documents. *See e.g.*, (Dkt. No. 86-7, Sullivan Depo. at 81: 10-13) (testifying Linden document dated August 12, 2019, listed Plaintiff as the "Operating Partner" for Advarra while he was also CEO of Advarra); *see also* (Dkt. Nos. 111-3; 111-4). Plaintiff was listed as an operating partner on Linden's website. *See e.g.*, (Dkt. No. 86-6, Shah Depo. at 231) (testifying that Plaintiff was like other operating partners who became full-time CEOs but remained at Linden in title and website).

The OPA contains a minimum advisory service requirement for operating partners to receive compensation.  It specifies that an operating partner must spend a minimum of 50 % of working time providing advisory services.  (Dkt. No. 86-1 at § 2). Plaintiff acknowledged this requirement in his deposition. (Dkt. No. 89-18, Donnelly Depo. at 91: 3-14).  Plaintiff testified that to fulfill his obligations under the OPA while working as CEO of Advarra, there were times he would stay up for three days straight.  (Dkt. No. 89-16 at 182: 13-21).  On the other hand, Linden testified that due to the service requirements in the OPA, it was not possible for Plaintiff

to serve as both operating partner at Linden and as CEO of Advarra concurrently.  *See* (Dkt. No. 86-7, Sullivan Depo. at 72: 6-9); (Dkt. No. 86-6, Shah Depo. at 132: 12-21).

Upon a careful review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds that there are genuine disputes of material fact as to whether Plaintiff performed operating partner services to Linden between November 7, 2017, and August 2019 as contemplated by the OPA for which he is entitled to compensation.  Plaintiff's partial motion for summary judgment is denied as to Plaintiff's claim for consulting fees against LCP III (Count I).

### 3.  Whether Plaintiff is Entitled to Earned Transaction Fees Under the OPA

Plaintiff alleges he is entitled to transaction fees from LCP III under the OPA for the following transactions: (1) ProPharma Group ("ProPharma")'s acquisition of Drug Safety Solutions in May/June 2017; (2) ProPharma's acquisition of Xendo, Sofus, and Solutions in Health in July/August 2018; (3) Linden acquisition of Schulman IRB ("Project Flight"); (4) LCP III's sale of Advarra to Genstar Capital ("Project Bearcat").  (Dkt. No. 66-2). The OPA states that an Operating Partner will receive compensation for certain transaction fees:

> "upon completion of an equity investment by Linden in a Target Company for which Operating Partner has significantly contributed to sourcing, winning and/or performing due diligence as determined solely by Linden in its own discretion.  Operating Partner will receive a cash fee of 10 % of the transaction fee related to the capital invested by LCP III and Linden Capital III-A LP as determined solely by Linden (such fee, the 'Transaction Fee').  As a condition to receipt of any Transaction Fee, Operating Partner will re-invest a substantial portion of the Transaction Fee (i.e., at least 50 % of the Transaction Fee)."

(Dkt. No. 95-1 at § 2).  On summary judgment, Defendants' move to dismiss Plaintiff's claim for transaction fees from LCP III for these deals.  (Dkt. No. 89). Defendants argue Plaintiff is not entitled to earned transaction fees for three main reasons: (1) LCP III did not make an equity investment as to Drug Safety Solutions, Project Flight, Solutions In Health, and Project Bearcat;

(2) the transaction was an "add-on" for which Linden did not pay transaction fees in its sole discretion as to Drug Safety Solutions, Project Flight, Xendo, and Solutions In Health; (3) Plaintiff did not source or otherwise significantly contribute to the transaction  as to Project Flight, Xendo, and Solutions In Health.

The Court previously ruled that any possible transaction fee under the OPA requires, in connection with the given transaction, an equity investment by LCP III.  (Dkt. No. 45 at 8). The Court will first review the record to determine whether there are any issues of material fact as to whether Linden made an equity investment in any of the disputed transactions.

### a.  Acquisition of Drug Safety Solutions

Plaintiff alleges he is entitled to $104,00.00 for his 10 % share of earned transaction fees for ProPharma's acquisition of Drug Safety Solutions in May/June of 2017.  (Dkt. No. 66-2 at 2). Defendants argue Plaintiff is not entitled to transaction fees connection with Drug Safety Solutions because LCP III did not make an equity investment in Drug Safety Solutions.  (Dkt. No. 89-1 at 27).  In response, Plaintiff argues Linden obtained a loan and invested it in the Drug Safety Solutions' acquisition.  (Dkt. No. 95 at 38-39).  Plaintiff argues this is an equity investment under the OPA because LCP III, as ProPharma's parent entity, used it to obtain an interest in Drug Safety Solutions.  (*Id.*).

The record reflects that in 2016 Linden acquired ProPharma and LCP III made an equity investment in ProPharma.  (Dkt. No. 89-1 at 27); (Dkt. No. 89-18, Donnelly Depo. at 152:12-153:15, 274:22-275:3, 278: 6-279: 6).  Plaintiff was paid a transaction fee in connection with LCP III's equity investment in ProPharma.  (*Id.* at 278:25-279:6).  In June 2017, ProPharma acquired Drug Safety Solutions.  (*Id.* at 274:25-275: 3); (Dkt. No. 111-6).  Plaintiff testified LCP III did not complete an equity investment in Drug Safety Solutions: "Q: The [Drug Safety Solutions]

transaction did not involve an equity investment by LCP III, correct? [ . . .] A. Correct." (Dkt. No. 89-18, Donnelly Depo. at 280:22-281:1). Plaintiff testified the Drug Safety Solutions acquisition was funded by a delayed draw term loan taken out by ProPharma; the rollover of funds from the seller; and cash from ProPharma's balance sheet. (*Id.* at 152:12-153:15, 274:22-276:21). The Funds Flow Memo associated with this deal indicates a delayed draw term loan was used to fund the deal. (Dkt. No. 95, Ex. 21, Funds Flow - - LINDEN_PKD_0015370(1).XLSX). Plaintiff's expert Henry L. Druker, M.B.A., J.D. states in his report that Linden obtained a loan to fund this deal. (Dkt. No. 89-8 at ¶ 52(a)). Mr. Druker testified that LCP III made an equity investment in Drug Safety Solutions and whether Linden's investment was in the form of a loan is not dispositive of whether Linden made an equity investment. (Dkt. No. 95-12, Druker Depo. at 108: 7-15) (a "private equity investment, by nature, is funded in part with equity and in part with debt.").

Upon a careful review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds that there is no question of material fact LCP III did not make an equity investment in the acquisition of Drug Safety Solutions because Plaintiff admits this in his deposition. An equity investment by LCP III is required for Plaintiff to earn a transaction tee. Therefore, Defendants' motion for summary judgment is granted as to Plaintiff's breach of contract claim for transaction fees against LCP III as to the Drug Safety Solutions acquisition (Count II).

### b. ProPharma's Acquisition of Xendo, Sofus, and Solutions in Health

Plaintiff alleges he is entitled to $178,000.00 for his 10% share of earned transaction fees from ProPharma's acquisition of Xendo, Sofus, and Solutions in Health in July/August 2018. (Dkt. No. 66-2). As to the Solutions in Health acquisition, Plaintiff argues LCP III made an equity investment by obtaining a loan to fund the deal and attain an interest in Solutions in Health. (Dkt.

No. 95 at 39).  Defendants argue Plaintiff's expert, Mr. Druker conceded LCP III did not make an equity investment in this transaction, thus Plaintiff is not entitled to transaction fees.  (Dkt. No. 89-1 at 29) (citing Dkt. No. 89-13, Druker Depo. at 116:11-118:12).

The record reflects that ProPharma, a Linden portfolio company, acquired Solutions in Health in August 2018.  (Dkt. No. 95 at 39); (Dkt. No. 89 at 17); (Dkt. No. 110-14).   The Funds Flow Memo associated with this deal indicates a loan was obtained to fund this deal.  (Dkt. No. 95, Ex. 37 LINDEN_PKD_0015371).  Mr. Druker's report states Linden obtained the loan to fund the deal.  (Dkt. No. 89-8 at ¶ 52(d)).  Mr. Druker testified the transaction was funded by a combination of Linden's loan, cash from ProPharma's balance sheet, and proceeds from the seller rolling over its equity or ownership.  (Dkt. No. 89-13, Druker Depo. at 115:11-118:12).  Mr. Druker testified that a private equity fund may purchase an equity interest in a company through several funding sources such as a partner's capital call cash funding, or with debt, but that "it is money either way." (*Id.* at 119: 2-24).

Upon a careful review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds there is an issue of material fact as to whether Linden made an equity investment in Solutions in Health and whether Plaintiff is entitled to transaction fees for this deal. Defendants' motion for summary judgment is denied as to Plaintiff's breach of contract claim for transaction fees against LCP III as to the Solutions in Health acquisition (Count II).

As to Xendo, there is no dispute that ProPharma acquired Xendo in July 2018.  (Dkt. No. 110-13).  Sofus was apart of Xendo.  (Dkt. No. 68 at ¶ 95).   There is no dispute that LCP III made an equity investment in ProPharma's acquisition of Xendo. (Dkt. No. 98 at 14); (Dkt. No. 95, Ex. 33 LINDEN_PKD_0015372.XLXS).  Defendants argue Plaintiff is not entitled to any transaction fee for this deal because it was an "add-on" for which Linden did not pay transaction fees in its sole

discretion and because Plaintiff did not otherwise significantly contribute to the transaction. As discussed in Section III (4) (b), the parties dispute whether the OPA contemplates transaction fees for "add-on" transactions and viewing the evidence in a light most favorable to the non-moving party, there is an issue of material fact as to whether Plaintiff significantly contributed to this transaction. *Compare* (Dkt. No. 89-7 at ¶ 167) *with* (89-9 at ¶ 52). Defendants' motion for summary judgment as to Plaintiff's breach of contract claim for transaction fees against LCP III is denied as to the Xendo/Sofus acquisition (Count II).

### c. Linden's Acquisition of Schulman IRB ("Project Flight") to Create Advarra

Plaintiff alleges he is entitled to $213, 900.00 for his 10 % share of earned transaction fees for Linden's acquisition of Schulman IRB ("Project Flight") in November 2017. (Dkt. No. 66-2 at 2). On summary judgment, Defendants argue Plaintiff is not entitled to transaction fees for this deal because LCP III did not make an equity investment in Advarra, but merely retained its prior equity investment in Chesapeake, which eventually merged with another entity to form Advarra. Plaintiff argues LCP III's original equity investment in Chesapeake amounts to an equity investment in Advarra because Chesapeake merged with another entity to form Advarra. (Dkt. No. 95 at 39).

The record reflects that Linden acquired Chesapeake in 2015 and LCP III made an equity investment. (Dkt. No. 89-12, Shah Decl. at ¶¶ 3-4). Plaintiff was paid transaction fees under the OPA for LCP III's equity investment in Chesapeake. (Dkt. No. 89-8, Druker Expert Report at ¶ 29) (stating ". . . under the terms of the OPA, I understand Mr. Donnelly was paid a transaction fee equal to 10 % of Linden's transaction fee received in connection with the Chesapeake deal); (Dkt. No. 89-11, Shah Depo. at 25: 20-26: 19) (testifying that Plaintiff was paid a transaction fee for the equity investment LCP III made into Chesapeake in 2015).

In 2017, Linden merged Chesapeake with Schulman IRB, which was owned by Northlane Capital Partners.  (Dkt. No. 110-10).  The merger culminated in the creation of Advarra.  (*Id.*). LCP III retained its preexisting 2015 equity investment in Chesapeake that appreciated in value due to the merger.  (Dkt. No. 89-13, Druker Depo. at 112: 4-9, 10-16) (testifying that to his knowledge, Linden itself did not invest new equity in connection with the merger of Chesapeake and Schulman to form Advarra); (Dkt. No. 89-11, Shah Depo. at 28: 1-10) (testifying that LCP III made one equity investment in Chesapeake in December 2015 and it continued until Linden sold Advarra in 2019, but LCP III did not make a new equity investment).

The Funds Flow Memo associated with this deal indicates a loan was obtained to fund the deal. (Dkt. No. 95 Ex 29, LINDEN_PKD_0015396.XLXS).  Linden partner, Kamlesh Shah testified this deal was funded solely by debt provided by Ares Capital corporation and LCP III did not invest any capital in the deal.  (Dkt. No. 89-11, Shah Depo. at 25: 10-19). Mr. Druker testified Linden's contribution of a pre-existing equity investment in Chesapeake amounts to the same as an equity investment in the merger that formed Advarra because Chesapeake merged with Schulman to form Advarra.  (Dkt. No.89-13, Druker Depo. at 111-12). Mr. Druker's report states that Linden's pre-existing equity investment in Chesapeake increased by a significant amount as a result of Chesapeake's merger with Schulman.  (Dkt. No. 89-8 at ¶ 52(b)).

Upon a careful review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds there is no issue of material fact LCP III did not make an equity investment in Advarra, but rather retained its pre-existing equity investment in Chesapeake for which Plaintiff already was paid a transaction fee.  As LCP III did not make an equity investment in Advarra, Plaintiff is not entitled to transaction fees for this deal.  Defendants' motion for

summary judgment is granted as to Plaintiff's breach of contract claim for transaction fees against LCP III for the merger that created Advarra (Count II).

### d. Linden's Sale of Advarra to Genstar Capital ("Project Bearcat")

Plaintiff alleges he is owed $2, 184, 848.00 for his 10 % share in earned transaction fees for Linden's sale of Advarra to Genstar Capital ("Project Bearcat") in July 2019.  (Dkt. No. 66-2 at 2).  On summary judgment, Defendants argue that Plaintiff is not eligible for a transaction fee for this deal because LCP III sold Advarra to Genstar Capital and did not make an equity investment in the sale.  Plaintiff argues LCP III made an equity investment in Advarra when Advarra was acquired and Linden maintained this equity investment until the moment of sale, for which it received a transaction fee.  (Dkt. No. 95 at 40).

The record reflects that in 2019, Linden sold Advarra to Genstar Capital.  (Dkt. No. 95-45). Plaintiff testified the sale of Advarra to Genstar Capital did not involve an equity investment of any kind by LCP III.  (Dkt. No. 89-18, Donnelley Depo. at 286: 2-8).  Plaintiff's Declaration states that LCP IV completed an equity investment for this transaction.  (Dkt. No. 62-1 at ¶22) (stating "based on my analysis of deal documents in my possession, this $ . . . million was a new equity investment by LCP IV.").  The Funds Flow Memo for this deal reflect that LCP IV, LCP IV-A, LP, and LCP Bearcat Blockers Corp. invested equity to fund this transaction.  (Dkt. No. 95-46 at 4). Plaintiff's expert, Mr. Druker, testified "at some point, Linden invested additional equity in [Advarra], in the form of preferred and common stock, and there was a sale of an interest and there was a transaction fee."  (Dkt. No. 95 Ex. 12, Druker Depo.  60:13-61).  Mr. Druker's report states "Linden invested $117.9 million in equity as part of the deal.  This investment was made through LCP IV and LCP Bearcat Blockers Corp."  (Dkt. No. 89-8 at ¶ 52(e)).

Upon a review of the record and viewing the evidence in a light most favorable to the non-moving part, the Court finds there is no issue of material fact LCP III did not make an equity investment in the sale of Advarra to Genstar Capital as Plaintiff admits this in his deposition. Therefore, Plaintiff is not entitled to transaction fees for this deal from LCP III. Defendants' motion for summary judgment is granted as to Plaintiff's breach of contract claim against LCP III for transaction fees as to Project Bearcat (Count II).

### 4. Other Disputes

#### a. Equity Investment

In response to Defendants' motion for summary judgment, Plaintiff argues the parties disagree as to the definition of "equity investment" as stated in the OPA. Plaintiff defines equity investment as "ownership interest of shareholders in a corporation." (Dkt. No. 95 at 36-37). Plaintiff's expert, Mr. Druker, testified a private equity company can choose to fund the purchase of an equity investment in a target company with proceeds of borrowings from a loan, from cash on the balance sheet, cash in their bank account, or cash called from limited partners. (Dkt. No. 89-13 at 109: 15-110-10). He testified the funds could also come in the form of borrowed debt, or services, or "an exchange of something else of value, a merger." (*Id.* at 110: 25-112: 13). He testified that whether the source of capital is borrowed or cash on the balance sheet of a platform company it's all legal tender capital to make an equity investment in the equity of a company. (*Id.* at 185: 15-186: 13).

Defendants set forth a narrower definition of equity investment as "using equity from [Linden's] fund to obtain an ownership interest in a company." (Dkt. No. 95-2, Davis Depo. at 36: 20-25). Defendants' expert, Anthony Ecock, explained that an equity investment would involve Linden making a capital call from their investors in a transaction where Linden would be

acquiring an entity using the equity that has been given to them by their limited partners. (Dkt. No. 110-7, Ecock Depo. at 146:10-24). Mr Ecock defined "equity" to mean "when limited partners . . . commit a certain level of equity . . . to Linden to invest on their behalf. . . Linden is an equity investor, so when Linden buys a platform company that requires a capital call from those investors to create that equity investment." (*Id.*).

Viewing the evidence in a light most favorable to the non-moving party, there is a question of material fact as to whether an equity investment involves any type of money used to fund the purchase of an interest in a company or whether it is restricted to drawing capital from a Linden capital partner.

### b. Add-on v Platform Investment

Defendants argue Plaintiff is not entitled to transaction fees because several of the transactions in dispute were "add-on" investments rather than "platform" investments for which Linden did not offer operating partners transaction fees. Plaintiff argues there is conflicting evidence in the record as to whether the parties agreed to distinguish between "platform" and "add-on" transactions under the OPA. (Dkt. No. 95 at 35).

The record reflects the OPA does not distinguish between platform and add-on investments as it relates to earning a transaction fee. The OPA states an "Operating Partner will receive a transaction fee upon completion of an equity investment by Linden in a Target Company for which Operating Partner has significantly contributed to. . .". (Dkt. No. 95-1 at § 2). Anthony Davis, Linden's Co-Founder, Managing Partner, and President testified that Linden never paid operating partners transaction fees for "add-on" transactions and Plaintiff's OPA did not contemplate transaction fees for such deals. (Dkt. No. 89-4, Davis Depo. at 168 at 20-25). Mr. Davis states Plaintiff understood that he was only entitled to transaction fees on platform acquisitions in which Linden completed an equity investment. (Dkt. No. 89-3 at ¶ 15). Linden partner, Kamlesh Shah,

testified LCP III only acquires target companies that are platform investments.  (Dkt. No. 89-11 at 40: 6-12).  He testified Linden portfolio companies acquire add-ons.  (*Id.* at 14). He testified Linden does not compensate operating partners for add- on transactions.  (Dkt. No. 110-3, Shah Depo. at 137: 24-138: 2-6).

Plaintiff testified the parties never came to an understanding the OPA contemplated Plaintiff's work for only "platform" transactions and did not include "add-on" transactions.  (Dkt. No. 111-2, Donnelly Depo. at 225: 16-23).  Plaintiff testified that drawing a distinction between "platform" and "add-on" transactions "wasn't the deal" he made.  (*Id.* at 340: 10-14). In an October 2017 email to Linden partner Kamlesh Shah, Plaintiff asked about transaction fee payments he did not receive for the Drug Safety Solutions acquisition.  (Dkt. No. 110-25).   Mr. Shah forwarded the email to Linden partners Tony Davis and Mark Sullivan.  (*Id.*).  Mr. Davis wrote back to Shah, "his DSS question is interesting since we have generally meant only platforms not add-ons- I wonder if we need to clarify with everyone." (*Id.*).  Mr. Sullivan wrote " . . . his agreement states fees related to Linden's equity investment in target companies.  DSS didn't require equity.  That said, we can be more specific re: platform vs add-on . . .".  (*Id.*).

Upon a careful review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds there is a question of material fact as to whether the parties contemplated a distinction between platform and add-on transactions upon which an operating partner can become eligible to earn a transaction fee under the OPA.

### c.  Linden's Discretion Not to Award Transaction Fees

Linden argues that there is no issue of material fact it had the right to exercise sole discretion not to award Plaintiff transaction fees under the OPA.  In his deposition, Plaintiff acknowledged that Linden had the discretion under the OPA to determine that Plaintiff was not entitled to any

portion of a transaction fee for each disputed transaction. (Dkt. No. 89-18, Donnelly Depo. at 342:22-343:6, 343:24-344:4, 346:3-13). Plaintiff's response in opposition argues there is a question of material fact as to whether Linden exercised such discretion. (Dkt. No. 95 at 40). For example, Linden partner Michael Farah testified that he did not know if Linden owed Plaintiff a transaction fee as a result of exercising its sole discretion to determine Plaintiff significantly contributed to sourcing, winning, or performing due diligence on the transactions. (Dkt. No. 110-1, Farah Depo. at 231-232); (Dkt. No. 98-2 Farah Depo. at 186-187) (testifying that Linden did not pay transaction fees to Linden because it does not pay transaction fees on add-ons); (Dkt. No. 89-7, Ecock Report at ¶ 165) (stating Linden paid Plaintiff transaction fees several times and there was no evidence Linden exercised this discretion under the OPA).

Upon a review of the record and viewing the evidence in a light most favorable to the non-moving party, the Court finds there is an issue of material fact as to whether Linden exercised its discretion not to award Plaintiff transaction fees and if so, whether Linden's actions were compatible with the implied covenant of good faith and fair dealing.

### 5. Plaintiff's Unjust Enrichment Claims

Plaintiff brings a claim for unjust enrichment as to LCP III which is plead in the alternative to Plaintiff's breach of contract claims against LCP III (Counts One and Two). (Dkt. No. 66). Defendants move for summary judgment as a matter of law as to Plaintiff's claim for unjust enrichment against LCP III on the ground the OPA is an express contract that governs the parties' claims.

Unjust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the Defendant has been unjustly enriched at the expense of the Plaintiff. "Unjust enrichment is a quasi-contractual theory of recovery. Under Illinois law, a plaintiff may not state

a claim for unjust enrichment when a contract governs the relationship between the parties." *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012 (7th Cir. 1985); *Ellis v. Smith Grading & Paving, Inc.*, 366 S.E.2d 12, 14 (S.C. Ct. App. 1998). Recovery under a theory of unjust enrichment is available only where the rights and responsibilities at issue are not governed by an express contract. *Palmetto Health Credit Union v. Open Sols.,Inc.*, 3:08-cv-3848-CMC, 2010 WL 2710551, at * 4 (D.S.C. July 7, 2010).

Plaintiff argues there is a question of material fact as to whether the OPA was in effect past November 2017 and therefore, Plaintiff's unjust enrichment claims against LCP III may proceed in the alternative. Plaintiff argues the Fourth Circuit has held that Plaintiffs are entitled to assert unjust enrichment in the alternative and that summary judgment is inappropriate when there is a genuine issue of material fact as to whether there was a valid agreement between the parties. *Kancor Ams., Inc. v. ATC Ingredients, Inc.*, No. 1:15-cv00589-GBL-IDD, 2016 U.S.Dist. LEXIS 23325, at * 27-30 (E.D. Va. Feb. 25, 2016).

In this case, the parties do not dispute the existence of a valid agreement between Plaintiff and LCP III. Plaintiff's response in opposition to Defendants' motion for summary judgment states, "[t]he OPA was a valid and enforceable contract. The OPA was an agreement between [Plaintiff], on one hand, and LCP III and affiliated investment funds, on the other hand." (Dkt. No. 95 at 2). The Court found there is a question of material fact as to whether the OPA was terminated between Plaintiff and LCP III after November 2017 and whether LCP III owes Plaintiff for certain consulting and transaction fees under the OPA.

As a valid agreement exists between Plaintiff and LCP III, Defendants' motion for summary judgment is granted as to Plaintiff's unjust enrichment claim against LCP III (Count III).

Defendant moves for summary judgment as to Plaintiff's claim for unjust enrichment as to LCP IV (Count IV). Plaintiff alleges that he worked as an operating partner to ensure the success of Project Bearcat. (*Id.* at ¶ 196). Plaintiff alleges he conducted presentations to prospective buyers, helped to develop an industry report to be shared with potential bidders, and participated in the presentations to various bidders. (*Id.* at ¶ 167). Plaintiff alleges all of the work he completed as an operating partner on this transaction benefitted LCP IV. (*Id.* at ¶ 200). Plaintiff alleges there was no contract governing the relationship between him and LCP IV. (*Id.* at ¶ 201).

Defendants argue it is undisputed Plaintiff disclaimed providing any advisory services to LCP IV in connection with the sale of Advarra. (Dkt. No. 89-1 at 38). Plaintiff testified he was not aware LCP IV was involved in any way in the sale of Advarra until after Linden and Genstar had signed a written agreement to move forward with the sale of Advarra: "Q: So it's your sworn testimony that you were not providing advisory services specifically to LCP IV in connection with the Bearcat deal? [ . . . ] A: I was not aware, as I was selling Advarra, that LCP IV was contemplating making an investment and was never aware of that until after the documents were signed." (Dkt. No. 89-18, Donnelly Depo. at 303: 4-14). Plaintiff also testified that he helped facilitate the successful sale of Advarra while wearing both hats of Advarra CEO and Linden operating partner. (Dkt. No. 89-27, Donnelly Depo. 291: 6-305:3). Plaintiff is included on several emails from 2019 with subject lines like "Project Bearcat-JPM Presentation", "Project Bearcat", "Bearcat- JPM Conference Buyers Profiles". (Dkt. Nos. 110-17; 119-18; 110-19).

Upon a review of the record and viewing the evidence in a light most favorable to the non-moving party, there is a question of material fact as to whether Plaintiff's work in connection with Project Bearcat conferred a benefit to LCP IV for which he is owed compensation. Defendants'

motion for summary judgment as to Plaintiff's unjust enrichment claim as to LCP IV is denied (Count IV).

### IV.    <u>Conclusion</u>

For the reason stated above, Plaintiff's partial motion for summary judgment is **DENIED**. (Dkt. No. 86).

Defendants' motion for summary judgment is **GRANTED IN PART**, **DENIED IN PART**. (Dkt. No. 89).  The motion is **GRANTED** as to:

    a.  Plaintiff's breach of contract claim against LCP III for transaction fees as to ProPharma Group's acquisition of Drug Safety Solutions (Count II);

    b.  Plaintiff's breach of contract claim against LCP III for transaction fees as to the merger of Chesapeake with Schulman ("Project Flight") to form Advarra (Count II);

    c.  Plaintiff's breach of contract claim against LCP III for transaction fees as to LCP III's sale of Advarra to Genstar Capital ("Project Bearcat") (Count II);

    d.  Plaintiff's unjust enrichment claim against LCP III (Count III).

The motion is otherwise **DENIED**.

**AND IT IS SO ORDERED**.

<u>s/ Richard M. Gergel</u>
Richard M. Gergel
United States District Judge

June 28, 2022
Charleston, South Carolina